**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN AUSTIN, | CASE NO. 1:13-cv-02878-GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 7, 8, 11, 14 |

## <u>MEMORANDUM</u>

## I.     Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff John Austin ("Plaintiff") for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff asserts that he is unable to perform light work because light work requires standing or walking for six hours out of an eight-hour work day and sit for two hours out of an eight-hour work day. Plaintiff submitted medical evidence of degenerative disc disease in his back and decreased sensation in his feet due to diabetes. The ALJ relied on an opinion by a state agency physician who testified at the hearing that Plaintiff could perform light work. However, Plaintiff had retained counsel only a few weeks before the

hearing, and had not yet submitted most of his medical evidence. The medical records reviewed by the physician painted a starkly brighter picture of Plaintiff's impairments and functioning than the more detailed and voluminous records submitted after the hearing. The medical expert specifically testified that there was a paucity of records on which to base the opinion at the time of the hearing. The medical records submitted after the physician's opinion included new medical findings of repeat lumbar spasm,  tenderness to palpation, pain on range of motion, pain on straight leg raise, loss of lumbar lordosis, hunched over gait, positive trigger points, positive straight leg raise, MRI findings,ans  decreased sensation in his feet. The medical records that were submitted after the physician's opinion also indicated new treatment with a Lidoderm patch, a trigger point injection, an escalating dose of medications, and orthopedic shoes. In contrast, the records submitted prior to the hearing and reviewed by the physician showed normal physical examinations, normal X-rays, and only a single instance of lumbar spasm. Thus, the ALJ erred in concluding, without the benefit of a medical opinion, that the later-submitted records merely confirmed the inferences gleaned from the earlier-submitted records. The ALJ failed to identify any other evidence that contradicted Plaintiff's claimed limitations in sitting, standing, and walking. Consequently, the Court cannot conclude that substantial evidence supports the ALJ's determination. For the foregoing reasons, the Court will grant Plaintiff's

appeal, vacate the decision of the Commissioner, and remand for further proceedings.

## II.     Procedural Background

On January 21, 2011, Plaintiff filed an application for DIB and SSI under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act").  (Tr. 150-62). On May 13, 2011, the Bureau of Disability Determination denied these applications (Tr. 47-58), and Plaintiff filed a request for a hearing on May 18, 2011.  (Tr. 59-61). On June 11, 2012, an ALJ held a hearing at which Plaintiff— who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 223-46).  On August 27, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 8-22). On September 7, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7), which the Appeals denied on September 30, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On November 25, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On March 5, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 7, 8). On May 19, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 11). On June 20, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 14). On June 13, 2014, the parties consented to

transfer of this case to the undersigned for adjudication. (Doc. 13, 15). The matter is now ripe for review.

## II.     Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## III.     Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also

determine Plaintiff's residual functional capacity ("RFC").    20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.   If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## IV. Relevant Facts in the Record

Plaintiff was born on February 14, 1960, and was classified by the Regulations as a as a person closely approaching advanced age on his alleged onset date, his application date, and his date last insured. (Tr. 167). 20 C.F.R. § 404.1563. Plaintiff attended special education classes through the ninth grade and did not attend school thereafter. (Tr. 30). Plaintiff testified that he cannot read. (Tr. 30).

### A. Allegations, Function Report, and Testimony

Plaintiff contends he is disabled because he is unable to perform the sitting, standing, and walking requirements of light work due to back pain from advanced neuroforaminal narrowing and foot numbness due to diabetes. He reported that his

back pain began worsening in late 2010 and rendered him unable to work as of December 10, 2010. (Tr. 11). On January 21, 2011, Plaintiff completed a teleclaim with a state agency employee. (Tr. 169). The employee noted that Plaintiff "continuously asked questions to a woman who was with him during the phone appointment" and "was very difficult to understand." (Tr. 168).

On January 27, 2011, Plaintiff's friend, Geraldine Siler, completed a function report on behalf of Plaintiff. (Tr. 200). Plaintiff indicated that his daily activities include only getting something to eat, walking "for a few minutes," going to doctor's appointments, watching television, and going to bed. (Tr. 191). He reported problems sleeping but no problems with personal care. (Tr. 192). He indicated that he makes sandwiches for himself daily, but that his cooking habits had changed since the onset of his conditions. (Tr. 193). He indicated that he "cleans the best way [he] can" and "when [he] get[s] in pain [he] stop[s]." (Tr. 193). He indicated that he did not spend a long time doing household chores "because someone help[s] [him] finish." (Tr. 193). He reported that he goes outside daily and shops for food in stores. (Tr. 194). He indicated that he watches television twice a week with his brother, but gets "tired a lot" and does not go anywhere on a regular basis. (Tr. 195).  He reported that he can walk up to "40 feet at times." (Tr. 196). He indicated that he gets "mad" and "angry a lot." (Tr. 197). Plaintiff explained that his back began hurting three or four months earlier, and

that it hurts when he stands, bends, gets up, or sits too long. (Tr. 198). He indicated that medication relieves his pain but may cause dizziness, drowsiness, or headaches. (Tr. 199). In a work history report completed on January 27, 2011, the individual completing the form indicated that he did not "remember the rest of" his jobs. (Tr. 178).

On June 11, 2012, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 23). Plaintiff testified that his glaucoma gives him headaches and blurry vision. (Tr. 31). He indicated that he had never had a desk job and could not read. (Tr. 30). He testified that, because of the disc protrusion in his lower back, he could not sit, stand, or walk for long periods of time. (Tr. 32). He testified that he treated his back pain with aspirin, Ultram, and Mobic. (Tr. 32). He testified that his doctors had increased his dosage of prescription medications to combat his back pain. (Tr. 33). He testified that if he sits for too long, he is unable to get up, and that it hurts to walk because the pain radiates to his feet. (Tr. 33). He testified that his foot is numb all day, every day and that he can walk no more than a block before needing to rest. (Tr. 34). He reported that he can stand for thirty minutes at a time. (Tr. 34). He indicated that he does not sit in a normal position, and instead "scooches" and sits with his arms on the arm of his chair to "keep the pressure from pushing [his] back down to [his] hip bone." (Tr. 34). He explained that he would not be able to sit in an office chair. (Tr. 34). He testified that he could only

sleep for thirty minutes at a time before he sweats so much that he has to get up and cool off. (Tr. 35). He indicated that most of his day is spent lying down and watching television or sitting in the sun. (Tr. 36). He testified that he does not perform any household chores. (Tr. 36).

### B. Medical evidence available to Dr. Armstrong

The ALJ concluded that Plaintiff was capable of performing light work, which requires six hours of standing or walking and two hours of sitting in an eight-hour work day. The ALJ found that Plaintiff's impairments could reasonably cause his pain and numbness. However, the ALJ found that Plaintiff was not fully credible regarding the extent of his pain and numbness. The ALJ reasoned that the medical evidence failed to establish objective findings that supported Plaintiff's claim. The ALJ relied on an opinion by state agency physician Dr. James Armstrong, M.D., that Plaintiff could perform work "at the light."

Dr. Armstrong reviewed sixty-one (61) pages of medical records, which included only treatment from a six-week period in December of 2010 and January of 2011 and an incomplete report from a consultative examination. (Tr. 229-290). Specifically, these records show that, on December 4, 2010, Plaintiff was treated at the Emergency Department at Wayne Memorial Hospital for a toothache. (Tr. 244). He denied musculoskeletal, back, and neurologic symptoms and pain. (Tr. 245). Aside from his tooth, his physical examination was normal. (Tr. 245).

On December 15, 2010, Plaintiff followed-up with his primary care provider, Melissa Rickard, CRNP. (Tr. 269). Plaintiff reported weight loss and fatigue, and had low back pain and muscle spasm on examination. (Tr. 269). Plaintiff received a prescription for thirty tablets of 10mg Ultram to take as needed and twenty tablets of 10mg Flexeril to take as needed. (Tr. 269). Ms. Rickard ordered multiple diagnostic tests. (Tr. 269). On December 28, 2010, an X-ray of Plaintiff's back was normal. (Tr. 240, 283). On January 4, 2011, Plaintiff followed-up with Ms. Rickard and reported foot pain. (Tr. 268). Testing indicated diabetes, and Ms. Rickard referred Plaintiff to a podiatrist and a nutritionist. (Tr. 268). Plaintiff's Ultram and Flexeril prescriptions are not mentioned. (Tr. 268). At a follow-up with Ms. Rickard on January 10, 2011, Plaintiff again exhibited muscle spasm. (Tr. 267). Ms. Rickard referred him to physical therapy, and did not mention his Ultram or Flexeril prescriptions. (Tr. 267). On January 11, 2011, Plaintiff was treated by a podiatrist for lesions on his feet that were verrucous, or wart-like, in nature. (Tr. 259). At a follow-up on January 19, 2011, Plaintiff reported that his physical therapy "reduces" his back pain. (Tr. 265). Plaintiff's Ultram and Flexeril prescriptions were not mentioned (or refilled). (Tr. 265).

The administrative transcript contains the mis-ordered first, third, and fourth pages of a consultative examination from Dr. Don Henderson, M.D. on March 8, 2011. (Tr. 287, 289-90, 355-56). It does not contain the second page of Dr.

Henderson's evaluation. (Tr. 289, 355-56). The report is missing portions of the review of symptoms and physical examination, likely contained on the omitted page two. (Tr. 287, 289-90). Dr. Henderson observed decreased range of motion and diagnosed lumbosacral pain, but noted he was "not aware of the results of any MRI." (Tr. 287). In discussing Dr. Henderson's report, Dr. Armstrong testified that they had "a CE [consultative examination] done, which was, once again, very brief." (Tr. 40).

No other medical evidence was submitted to Dr. Armstrong.[1] Based on the above records, Dr. Armstrong testified that the case was "significant in its marked paucity of records…he must have significant back pain." (Tr. 39). He noted that Plaintiff's December 10, 2010 X-ray and physical examination were normal, his hyperkeratosis of his feet was "not diabetic" and "not secondary to neuropathy," and that he had decreased range of motion at his consultative examination. (Tr. 39-40). He explained, "that's really all we really have on Mr. Austin…I would have

---

[1] The record also contains RFC assessments from a single decision-maker ("SDM") at the state agency. (Tr. 290-97). However, this was a "single decision-maker ("SDM")" who "is a non-examining, nonmedical employee at the state agency level." *Chandler v. Colvin*, 3:14-CV-867, 2014 WL 4793963, at *13 (M.D. Pa. Sept. 23, 2014) (Conaboy, J.) (citing *Yorkus v. Astrue*, CIV.A. 10-2197, 2011 WL 7400189, at *4 (E.D. Pa. Feb. 28, 2011) ("There is significant case law supporting the plaintiff's position that the RFC assessment of the SDM is entitled to no evidentiary weight. Additionally, the Agency's own policy prohibits the ALJ from relying on the RFC assessments of an SDM.") (internal citations omitted)).

no argument placing him at the light. But, as far as a lot of records to support this, they're just not there. That's it." (Tr. 40).

### C. Medical evidence submitted after Dr. Armstrong's Opinion

The remaining medical evidence was not available to Dr. Armstrong. These records show that, on January 17, 2011, Plaintiff had a physical therapy evaluation. (Tr. 357). He failed to attend any subsequent appointments and was discharged on February 4, 2011. (Tr. 357).

On April 18, 2011, Plaintiff followed-up with Ms. Rickard. (Tr. 328). He reported back pain at an eight out of ten and indicated that he had "completed" physical therapy.[2] (Tr. 328). He reported that Flexeril was ineffective. (Tr. 328). On examination, Plaintiff had muscle spasm and a positive straight leg raise. (Tr. 328). Plaintiff also reported throat and ear symptoms, which Ms. Richard diagnosed as sinusitis. (Tr. 328). Ms. Rickard added Mobic to Plaintiff's medication regimen and referred Plaintiff to a physiatrist. (Tr. 340).

On April 19, 2011, Plaintiff presented to the emergency room at Wayne Memorial Hospital complaining of abdominal pain, lethargy, nausea, and vomiting. (Tr. 344). He also reported musculoskeletal problems from lifting. (Tr. 350). Plaintiff was admitted with what physicians felt could be an occult mild drug reaction or primary symptoms triggered by inflammation of the ear.  (Tr. 344).

---

[2] The record contains no evidence that the ALJ attempted to determine whether Plaintiff had additional physical therapy.

Plaintiff also had a "clearly abnormal" EKG and a bacterial H. pylori infection. (Tr. 348). Plaintiff was hydrated and his gastrointestinal symptoms resolved. (Tr. 344). On April 20, 2011, Plaintiff was discharged. (Tr. 344).

Later that day, physiatrist Dr. Scott Epstein, M.D., evaluated Plaintiff. (Tr. 342). Plaintiff reported pain that ranged from a seven to a nine on a ten-point scale that was worse with bending, arching his back, standing, getting up, and walking and better with lying supine, side bending, side lying and sitting. (Tr. 340). He reported restarting physical therapy and that he was waiting for MRI consideration. (Tr. 340). Plaintiff reported that his sitting and walking tolerance was "not long" and that he could stand for about an hour. (Tr. 341). He indicated that he was able to perform self-care but needed assistance cleaning his house. (Tr. 341).

Physical examination indicated tenderness to palpation, pain on extension, lumbosacral pain, pain on straight leg raise, mild paraspinal tightness, and mild loss of lumbar lordosis. (Tr. 341). Dr. Epstein indicated that Plaintiff had "[l]ow back pain, I suspect it is probably facet joint in nature given that he has axial low back pain that is worse on end forward flexion and extension, and worse on extension when accompanied by bilateral movements." (Tr. 341). Dr. Epstein recommended Plaintiff refrain from taking Ultram and Mobic because he was having gastrointestinal complaints. (Tr. 341). Dr. Epstein prescribed a Lidoderm

patch and indicated than an MRI of the lumbar spine was "reasonable and appropriate." (Tr. 341).

On April 25, 2011, Plaintiff followed-up with Dr. Epstein to review his MRI. (Tr. 339). The MRI indicated "a right lateral disc protrusion at L4-5 with advanced right L4 neuroforaminal narrowing" and "[d]isc bulging 12-3, L3-4, L4-5, L5-S1 with moderate right lateral recess narrowing at L5-S1." (Tr. 339). On physical examination, Plaintiff had "a hunched over gait pattern," muscle spasm, positive straight leg raise, and a trigger point. (Tr. 339). Dr. Esptein opined that Plaintiff's lower "back pain [was] probably from the right lateral disc bulge at L4-5." (Tr. 339). Dr. Epstein injected Lidocaine at the trigger point. (Tr. 339). Plaintiff continued to take 81 m.g. of Aspirin per day and 15 m.g. Mobic per day. (Tr. 339). Plaintiff's Ultram was increased to one or two 50 m.g. every four hours as needed. (Tr. 339).

On May 18, 2011, Plaintiff followed-up with Ms. Rickard. (Tr. 327). Plaintiff indicated that he was continuing to treat with Dr. Epstein for back pain and exhibited muscle spasm. (Tr. 327).

On June 15, 2011, Plaintiff followed-up with Ms. Rickard. (Tr. 326). He reported fatigue and back pain, although he indicated that his back pain had decreased to a five on a ten-point scale. (Tr. 326). Plaintiff was again provided with a prescription for twenty tablets of 10 m.g. Flexeril, and his Ultram was

increased to one hundred and twenty tablets at 50 m.g. (Tr. 326). Plaintiff also reported depression and anxiety, and was referred to a behavioral health specialist. (Tr. 326).

On February 13, 2012, Plaintiff followed-up with Ms. Rickard. (Tr. 318). Plaintiff reported complying with medications and diet and monitoring his blood sugar. (Tr. 318). Plaintiff denied side effects from medications. (Tr. 318). Plaintiff complained of fatigue and congestion. (Tr. 319). Plaintiff's foot examination was normal, except for thickened nails, and his medications were continued. (Tr. 320).

On March 22, 2012, Plaintiff followed-up with Ms. Rickard. (Tr. 313). Plaintiff complained of hand pain and stiffness and constipation. (Tr. 313). He indicated compliance with his diet and that he was testing his blood sugars. (Tr. 313). Plaintiff had diminished sensation in his feet and his toenails were thickened. (Tr. 315). Plaintiff's prescriptions included 15 m.g. of Mobic epr day and 50 m.g. of Ultram every six hours. (Tr. 316).

On June 14, 2012, Plaintiff followed-up with Ms. Rickard. (Tr. 308). Plaintiff indicated that he had not been performing home blood monitoring or exercising, but was complying with medications and diet. (Tr. 308). Plaintiff reported chronic back pain and indicated "Ultram effectie [sic] for pain." (Tr. 308). Plaintiff had not obtained the diagnostics ordered at the last visit. (Tr. 308). Plaintiff reported aching pain in his lower back that was a six on a ten-point scale.

(Tr. 310). On examination, Plaintiff had diminished sensation and fungal nail infections on each foot. (Tr. 310). Plaintiff was referred to a podiatrist. (Tr. 312). Plaintiff was prescribed 15 m.g. of Mobic per day, 500 m.g. of Metformin per day, and 50 m.g. of Ultram every six hours. (Tr. 308). Plaintiff also took 81 m.g. of Aspirin per day. (Tr. 309).

On June 28, 2012, Dr. Epstein completed a Foot Evaluation Form. (Tr. 374). He indicated that Plaintiff had most recently been seen on June 25, 2012.[3] (Tr. 374). Dr. Epstein noted that Plaintiff's ambulation was "limited" and that he lived at home "with assistance." (Tr. 374). Dr. Epstein indicated that Plaintiff needed "custom fit extra depth shoes" to protect a "sensation-compromised foot," accommodate feet deformity, and optimize his gait. (Tr. 374). Dr. Epstein cited limited proprioception and vascularity, pes planus, and pronation in the bilateral feet. (Tr. 375). There were no subsequent medical records before the ALJ.[4]

### D. ALJ Findings

On August 27, 2012, the ALJ issued the decision. At step one, the ALJ found that Plaintiff was insured through June 30, 2013, and had not engaged in

---

[3] There is no evidence the ALJ attempted to obtain any records from Dr. Epstein subsequent to his April 2011 assessment.

[4] The record contains additional evidence submitted to the Appeals Council. (Tr. 378-496). Evidence submitted after an ALJ decision should not be used to determine whether substantial evidence supports the ALJ decision, so the Court did not consider it here. *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). However, because the Court remands on other grounds, these records will be before the ALJ for review.

substantial gainful activity since December 10, 2010, the alleged onset date. (Tr. 13). At step two, the ALJ found that Plaintiff's "glaucoma, diabetes, and disorder of the back" were medically determinable and severe. (Tr. 13). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 14). The ALJ found that Plaintiff had the RFC to:

> [P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations; occasionally stoop, crouch, kneel, crawl, and balance; occasionally climb stairs; and no work around hazards, ladders, or moving machinery. Claimant has a mild to moderate chronic pain which is of sufficient severity to be noticeable to him all times but he would be able to remain attentive and responsive in a work setting and could carry out normal work assignments satisfactorily. Claimant also takes medications to relieve his symptoms but the medications do not preclude him from functioning at the level indicated and he would remain reasonably alert to perform required functions presented by his work setting. While function [sic] at this level, claimant will find it necessary to changes positions to relieve his symptoms from time to time.

(Tr. 14). At step four, the ALJ found that Plaintiff could not perform past relevant work. (Tr. 17). At step five, the ALJ found that Plaintiff could perform other work in the national economy as a counter clerk, DOT 311.477-014, light product packager, DOT 920.685-082, and a marker, DOT 209.567-034. (Tr. 18). Consequently, the ALJ found that Plaintiff was not disabled under the Act and not entitled to benefits. (Tr. 19).

## VI. Plaintiff Allegations of Error

If Plaintiff is unable to perform work at the light duty level or higher, he will be found disabled on the basis of his age and education. The ALJ concluded that Plaintiff could perform light work, which requires standing or walking for six hours out of an eight-hour workday, on the basis of a non-treating state agency physician's opinion. (Tr. 8-18). Plaintiff asserts that this conclusion lacks substantial evidence because the state agency physician did not review any of Plaintiff's multiple abnormal imaging studies in his back and hip which corroborate his claims of difficulty walking. (Pl. Brief at 8-10). Defendant responds that the subsequent records do not support Plaintiff's claim and notes that the Third Circuit has held that a state agency opinion may provide the ALJ with substantial evidence. (Def. Brief at 14-18) (citing *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356,361-63 (3d Cir. 2011)).

The Third Circuit in *Chandler* noted:

> [B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it.

*Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). However, Chandler does not stand for the proposition that a non-treating, non-examining state agency physician's opinion automatically provides substantial evidence to an ALJ's decision. Chandler holds only that a non-treating, non-examining state

agency physician's opinion "may" provide substantial evidence to an ALJ's decision. Passage of time alone does not preclude an ALJ from relying on the opinion. However, the passage of time is relevant when it requires the ALJ to undertake a significant independent review of probative, non-cumulative objective evidence. "An ALJ may not make purely speculative inferences from medical reports." *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981); *see also Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) ("By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician"). *Chandler*'s holding must be construed in accord with *Smith* and *Ferguson*. *Gunder v. Astrue,* Civil No. 11–300, slip op. at 44–46 (M.D.Pa. February 15, 2012) (Conaboy, J.) ("Any statement in *Chandler* which conflicts (or arguably conflicts) with *Doak* is *dicta* and must be disregarded") (citing *Government of Virgin Islands v. Mills,* 634 F.3d 746, 750 (3d Cir.2011) (a three member panel of the Court of Appeals cannot set aside or overrule a precedential opinion of a prior three member panel)).

In *Chandler*, the evidence that was submitted subsequent to the statement agency opinion did not require independent review. The Court explained that:

> The new medical evidence generated after Dr. Popat's review did not
> undermine his conclusion. Chandler's September 2008 Progress Note
> says: "[H]er foot pain has improved. They gave her a new antenna for
> her spinal cord stimulator and things have improved.... She really feels
> comfortable with her medications at this time and does not want to
> change anything.... She has stopped smoking marijuana." Just before

> the ALJ hearing, in May 2009, Chandler's fentanyl patch was
> "tak[ing] the edge off," and "she [was] able to do her activities of
> daily living." Chandler was experiencing some new hand pain but was
> able to "use a computer frequently."

*Chandler*, 667 F.3d at 363. No independent interpretation is needed when medical records specifically state that a claimant has "improved," is "comfortable," and is "able to do her activities of daily living." *Id.*

Here, the ALJ was required to independently evaluate almost all of the probative medical evidence. Only sixty-one (61) pages of medical records were available to Dr. Armstrong and the ALJ at the time of the hearing. (Tr. 229-290). These records contained only Dr. Henderson's incomplete consultative examination and treatment records over a six-week period from December of 2010 to January of 2011. They showed only that Plaintiff either denied or did not report musculoskeletal pain while being treated for a toothache, had normal physical examination on one of the three primary care visits, normal X-rays, and was prescribed physical therapy and a stable dose of medications. The only objective abnormal finding relating to Plaintiff's back in the records reviewed by Dr. Armstrong was muscle spasm. Similarly, the records reviewed by Dr. Armstrong pertinent to diabetes indicated that Plaintiff's sensation was intact.

In comparison, the records reviewed only by the ALJ indicated objective findings of repeat lumbar spasm, tenderness to palpation, pain on range of motion, pain on straight leg raise, loss of lumbar lordosis, hunched over gait, positive

trigger points, positive straight leg raise, and an abnormal MRI. The records reviewed only by the ALJ also showed that Plaintiff's treatment regime was expanded to include a Lidoderm patch, a trigger point injection, and a escalating dose of medications. The records reviewed by Dr. Amstrong show that Plaintiff received a single prescription for 10 m.g. Ultram to take as needed, which was not refilled. The records that were not reviewed by Dr. Armstrong show that, by June of 2012, Plaintiff was taking five times that dosage, 50 m.g., every six hours. (Tr. 313). With regard to diabetes, the records reviewed only by the ALJ indicated multiple instances of decreased sensation in Plaintiff's feet and treatment with orthopedic shoes.

In reviewing these records, the ALJ simply lists the multiple objective findings, and then states that the objective evidence fails to support Plaintiff's claims. Given that the ALJ has no medical training, this is insufficient to conclude that the objective evidence provides a basis to reject Plaintiff's claims. No medical expert evaluated the impact that repeat lumbar spasm,  tenderness to palpation, pain on range of motion, pain on straight leg raise, loss of lumbar lordosis, hunched over gait, positive trigger points, positive straight leg raise, MRI findings, decreased sensation in his feet, treatment with a Lidoderm patch, a trigger point injection, an escalating dose of medications, and orthopedic shoes would have on Plaintiff's ability to stand and walk for six hours out of an eight-hour workday.

Consequently, the ALJ was forced to improperly independently interpret the vast majority of the relevant evidence. *See Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *Doak v. Heckler,* 790 F.2d 26, 29 (3d Cir.1986).

Defendant's contention that Dr. Armstrong would not have changed his opinion if he had the opportunity to review the subsequent records is undermined by Dr. Armstrong's own testimony. He explained, "that's really all we really have on Mr. Austin…I would have no argument placing him at the light. But, as far as a lot of records to support this, they're just not there. That's it." (Tr. 40).[5] He specifically testified that there was a "paucity" of records to "support" his opinion. *Id.*

Dr. Anderson's opinion is limited by the medical evidence on which it is based. Dr. Anderson assessed the functional capabilities of a claimant who treated only with a single prescription for narcotics, never refilled, and physical therapy; exhibited only one symptom, muscle spasm, as objective evidence; and had no abnormalities documented in diagnostic imaging. This does not describe Plaintiff.

The Court remands for the ALJ to properly evaluate the medical records submitted after the medical expert testimony, which likely requires obtaining an interpretation from an individual with medical training. Because the Court

---

[5] Moreover, Dr. Armstrong's opinion lacked specificity. He stated only that Plaintiff could perform "at the light." (Tr. 40).

recommends remand on these grounds, the Court declines to address Plaintiff's other allegations of error.

### VII.    Conclusion

The Court finds that the ALJ's decision lacks substantial evidence because the ALJ failed to properly evaluate medical records submitted subsequent to the medical expert's testimony. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.

Dated: July 23, 2015                          *s/Gerald B. Cohn*
                                      GERALD B. COHN
                                 UNITED STATES MAGISTRATE JUDGE